UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM WHITE, R. CARLEEN CORDWELL, KEN BAILEY, NADINE MONACO, KAREN LODGE, HENRY KRIEGSTEIN, JOAN KRIEGSTEIN, and HILARY SCHULTZ<br>Plaintiffs<br><br>v.<br><br>R.M. PACKER COMPANY, INC., DRAKE PETROLEUM CO., INC., KENYON OIL COMPANY, MID-VALLEY OIL COMPANY, DEPOT CORNER, INC., FRANCIS J. PACIELLO d/b/a EDGARTOWN MOBIL<br>Defendants | CIVIL ACTION NO. 07-CV-11601-MLW |

DEFENDANTS DEPOT CORNER, INC.'S AND FRANCIS J. PACIELLO'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

Defendants Depot Corner Inc. and Francis J. Paciello d/b/a Edgartown Mobil (collectively "Depot Corner")[1] respectfully ask this Court to grant summary judgment in its favor with respect to Count IV of the plaintiffs' Amended Complaint, which alleges price-gouging in violation of Mass. Regs. Code Title 940, § 3.18 and Massachusetts General Laws, Chapter 93A. As explained in greater detail below, Depot Corner did not engage in price-gouging under either of these laws because it did not sell any petroleum products at an unconscionably high price.

---

[1] All of the sales made during the relevant period were made by Depot Corner, Inc. To the extent the plaintiffs allege Francis Paciello ran Edgartown Mobile, the prices would be the same.

1

# ARGUMENT

## I. Price-Gouging Under 940 CMR 3.18

The Massachusetts price-gouging regulation, Massachusetts Regs. Code Title 940, § 3.18 (hereinafter "Section 3.18"), was promulgated by the Attorney General pursuant to Mass. General Laws, Chapter 93A § 2(c). Section 3.18, which is captioned "Price-Gouging," reads as follows:

> (1) It shall be an unfair or deceptive act or practice, during any market emergency, for any petroleum-related business to sell or offer to sell any petroleum product for an amount that represents an unconscionably high price.
>
> (2) A price is unconscionably high if:
>
> > (a) the amount charged represents a gross disparity between the price of the petroleum product and
> >
> > > 1. the price at which the same product was sold or offered for sale by the petroleum-related business in the usual course of business immediately prior to the onset of the market emergency, or
> > >
> > > 2. the price at which the same or similar petroleum product is readily obtainable by other buyers in the trade area; and
> >
> > (b) the disparity is not substantially attributable to increased prices charged by the petroleum-related business suppliers or increased costs due to an abnormal market disruption.

Price-gouging occurs under the statute if, during a "market emergency,"[2] a petroleum-related business sells or offers to sell petroleum products at a "unconscionably high price."

---

[2] A market emergency is defined as "[a]ny abnormal disruption of any market for petroleum products, including but not limited to any actual or threatened shortage in the supply of petroleum products or any actual or threatened increase in the price of petroleum products, resulting from severe weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, act of war, national or local emergency or other extraordinary adverse circumstances." Mass. Regs. Code Title 940, § 3.01. For purposes of this memorandum, Depot Corner will accept the plaintiffs' contention that a market emergency

2

Under the regulation, a price will be "unconscionably high" if (a) the amount charged represents a "gross disparity" between the price of the product and either 1) the price at which it was sold immediately prior to the onset of the market emergency or 2) the price at which that product "is readily obtainable by other buyers in the trade area;" and (b) "the disparity is not substantially attributable to increased prices charged by the petroleum-related business suppliers or increased costs due to an abnormal market disruption." 940 CMR 3.18.

### A.     Scope of this Memorandum

In this memorandum, Depot Corner will focus on 3.18(2)(a). If the Court agrees with Depot Corner's arguments regarding 3.18(2)(a), that would dispose of the plaintiffs' price-gouging claim under 3.18 and there would be no need to also consider 3.18(2)(b). Should the Court have occasion to reach 3.18(2)(b), Depot Corner will make arguments regarding 3.18(2)(b) at the appropriate time.[3]

In addition, this memorandum of law is focused primarily on 3.18(2)(a)(1) (which relates to the disparity between the prices Depot Corner charged before and during the market emergency period), rather than on 3.18(2)(a)(2) (which would pertain to the differences between Depot Corner's prices and those "readily obtainable by other buyers in the trade area"). The allegations of price-gouging in the Amended Complaint appear to be premised entirely on the former rather than the latter. (See Amended Complaint at ¶¶ 71-91 (collectively captioned "Price Gouging")). Moreover, the plaintiffs allege that the prices on the island of Martha's

---

commenced on August 29, 2005, and concluded on December 1, 2005. (Amended Complaint at ¶ 78).

[3] Were this Court's inquiry to proceed to the second prong, Depot Corner would show that price increases were substantially attributable to market conditions and increased costs. (The notion that Depot Corner deviously sought to take advantage of the market emergency to squeeze a few extra cents per gallon from hapless consumers is absurd.)

3

Vineyard are substantially similar (see Amended Complaint at ¶¶ 32-57) and have stated that the prices the plaintiffs may have paid on off-island locations are irrelevant (see Plaintiffs' Responses to Requests for Documents, Responses Nos. 3 & 6; October 14, 2008 letter from Michael Roitman, Cain Affidavit, Exhibit A).

In any event, even if the allegations made in other parts of the Amended Complaint that reference disparities between gasoline prices on Cape Cod and those on the Martha's Vineyard were used to support allegations of price-gouging, the plaintiffs' contentions would fall short. First, the prices charged on Cape Cod would have little bearing on any 3.18(2)(a)(2) inquiry because gasoline purchased on Cape Cod is not "readily obtainable by buyers" in the Down Island area. As Louis Paciello's affidavit shows, it would make no practical or economic sense for a consumer in Martha's Vineyard to make the trek to Cape Cod, incur the transportation costs associated with the trip (to and from the Cape), and then make his or her way back to Martha's Vineyard, merely to purchase gasoline. (See Paciello Affidavit at ¶ 4). Second, the prices charged on Cape Cod and Martha's Vineyard differ because of various factors. These factors include the costs of transportation --- as the plaintiffs recognize --- but also different consumption patterns, seasonal variations, and other market differences. Finally, as will be made clear in what follows, the differences between the prices charged on Cape Cod and those charged by Depot Corner, are simply too small to support the conclusion that Depot Corner engaged in price-gouging. For example, even if Depot Corner's price on November 19, 2005 was 53.06% higher than the least expensive price available in Southeast Massachusetts (see Amended Complaint at ¶ 63(1)), that disparity would not be enough to constitute price-gouging.[4]

---

[4] The plaintiffs contend that the prices charged for gasoline on that day were $0.96 to $1.04 higher than the least expensive gasoline available in Southeast Massachusetts. Depot Corner's price on that day was $3.00. (Paciello Affidavit, Exhibit A). Assuming for the sake of discussion that Depot Corner's price represented the $1.04 disparity, that would mean that the

## B.     940 CMR 3.18(2)(a)(1)

Depot Corner has not found any case law interpreting the Massachusetts price-gouging regulation. Moreover, the term "price-gouging," itself, is imprecise and admits of various meanings, with different jurisdictions defining the concept in different ways. See Federal Trade Commission Report, Investigation of Gasoline Price Manipulation and Post-Katrina Gasoline Price Increases (Spring 2006), at 137 n.2, 189-97 (noting the variation in states' approaches). Two operative terms in the regulation, however, "unconscionably" and "gross disparity," have recognizable legal meanings. Where recognized legal terms and concepts are employed in a regulation, those terms and concepts should be construed in light of their commonly accepted legal sense. See 2B Norman J. Singer, Sutherland Statutory Construction § 47.30 at 361-66 (6th ed. 2000) (absent evidence to the contrary, "legal terms in a statute are presumed to have been used in their legal sense"); Commonwealth v. Davie, 46 Mass. App. Ct. 25, 28, 703 N.E.2d 236, 239 (Mass.App.Ct. 1998) ("In the absence of a statutory definition of 'park,' we first look to the usual and accepted meaning of that word. We derive such meaning 'from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions.'") (citing Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369, 361 N.E.2d 1239 (1977)).[5] Accordingly, the terms "unconscionably" (for which Depot Corner will employ the

---

lowest price charged in Southeast Massachusetts was $1.96, resulting in a difference between that price and Depot Corner's price of 53.06%. Of course, if the $0.20 per gallon additional cost per gallon for transportation asserted by the plaintiffs were subtracted from the $1.04 disparity, the resulting difference would be even less, 38.88%.

[5] The canons of statutory construction apply to the interpretation of regulations. See Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550, 574 N.E.2d 364 (1991) ("We interpret a regulation in the same manner as a statute, and according to traditional rules of statutory construction.").

more familiar nominal and adjectival forms, "unconscionability" and "unconscionable") and "gross disparity" should be construed in light of their recognized legal meaning.

### C.     Unconscionability

Unconscionability has two complementary, but distinct, dimensions: the procedural and the substantive. See Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 329 (1st Cir. 2008) (recognizing the two kinds of unconscionability under Massachusetts law). The former relates to the circumstances surrounding the formation of the contract; the latter concerns the contracts terms themselves. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 294 n.13, 408 N.E.2d 1370, 1377(1980) (delineating the difference between the two dimensions of unconscionability). In setting forth the requirements for an "unconscionably high price," 3.18(2)(a)(1) refers to differences between the sale price before the market emergency and the sale price after the emergency. Accordingly, 3.18(2)(a)(1) is clearly aimed at combating so-called "substantive unconscionability," which looks to the terms of the sale itself rather than the circumstances attending contract formation.

Under Massachusetts law, a sale will be substantively unconscionable if there is "gross disparity in the consideration," such that the "disparity 'itself leads inevitably to the felt conclusion that knowing advantage was taken of [one party].'" Waters v. Min Ltd., 587 N.E.2d 231, 233 (Mass. 1992) (alteration in original) (quoting Jones v. Star Credit Corp., 59 Misc.2d 189, 192, 298 N.Y.S.2d 264 (N.Y. Sup. Ct. 1969)). To put it another way, courts will find a contract substantively unconscionable if the "disparity of interests in [the] contract is 'so gross that the court cannot resist the inference that it was improperly obtained and is unconscionable.'" Id. (citing In re Estate of Vought, 351 N.Y.S.2d 816, 76 Misc.2d 755 (N.Y. Sup. Ct. 1973)).

Courts will not find a contract substantively unconscionable unless the price for the good or service is substantially higher than its value. Courts typically require the price to be two or

more times greater than its retail value. For an illustrative list of such cases, Depot Corner refers the Court to this compilation located in the Massachusetts Practice Series chapter on Inflated Price:

> Murphy v. McNamara, 36 Conn.Sup. 183, 416 A.2d 170 (1979) (conditional sale disguised as 18-month lease required payment of $1,268 for color TV sold at retail for $499, more than 2 times regular retail sales price); Toker v. Perl, 103 N.J.Super. 500, 247 A.2d 701 (1968), affirmed 108 N.J.Super. 129, 260 A.2d 244 (1970) (price of $799.95 for freezer was more than 2 times maximum value of $300); Toker v. Westerman, 113 N.J.Super. 452, 274 A.2d 78 (1970) (cash price of $899.98 for freezer was approximately 2 times reasonable retail value of $350–$400); Jones v. Star Credit Corp., 59 Misc.2d 189, 298 N.Y.S.2d 264 (1969) (contract price 4.8 times "maximum retail value of approximately $300"); In re Stewart, 93 B.R. 878 (Bkrtcy.E.D.Pa.1988) (under Pennsylvania law, charging $2,625.84 for credit purchase of TV and VCR with cash price of $867, where seller admitted that he marked up items greater than twice their retail price in order to accommodate his liberal credit policies, was unconscionable); People ex rel. Vacco v. Beach Boys Equipment Co., Inc., 273 A.D.2d 850, 709 N.Y.S.2d 729 (2000) (retail price of $1,200 for electric generator following ice storm was unconscionably excessive price, where other retailers in trade area charged less than one half of that price for same generator). See also Remco Enterprises, Inc. v. Houston, 9 Kan.App.2d 296, 677 P.2d 567 (1984) (stating that where contract price is more than 2 times fair retail value of goods, there is greatly increased possibility that it will be found unconscionable, but holding under circumstances that contract charging roughly twice fair retail value and slightly more than 3 times wholesale value was not unconscionable).

Howard J. Alperin, 35 *Massachusetts Practice Series: Consumer Law,* § 5:34 n. 18 (2d ed. current through 2007-2008 Pocket Part) (collecting cases). Unconscionability based on differences between the price and the wholesale value is often based on greater disparities:

> Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971) (cash sale price of $249.50 for children's educational books was six or seven times wholesale price of $35–$40 and about 2 times maximum retail value of $108–$110); Coleman v. Fiore Bros., Inc., 113 N.J. 594, 552 A.2d 141 (1989) (contract in which homeowner was charged $5,000 plus finance charges, for total of $14,951, for 12 windows which cost defendant only $611 installed, would be

7

> "demonstrably unconscionable"); Frostifresh Corp. v. Reynoso, 52
> Misc.2d 26, 274 N.Y.S.2d 757 (1966), reversed on other grounds
> 54 Misc.2d 119, 281 N.Y.S.2d 964 (1967) (contract price 3.29
> times wholesale price); State by Lefkowitz v. ITM, Inc., 52
> Misc.2d 39, 275 N.Y.S.2d 303 (1966) (prices varied from two to
> six times cost of units to merchant).

Massachusetts Practice Series: Consumer Law, § 5:34 n. 19.[6] In this case, the disparity between the prices charged before the market emergency and those charged after the market emergency is rather modest. Indeed, the average price Depot Corner charged for a gallon of gasoline during the proposed market emergency period was only 3.65% higher than the price it charged during the eleven days preceding the commencement of the market emergency.[7] Even the highest prices Depot Corner charged during the proposed market emergency period were never more than 18.23% greater than the prices charged during the period immediately preceding the market emergency. The unconscionability cases cited above involved increases from 200% and 600%. An 18.23% increase, which reflects the greatest pricing disparity, does not even come close.

Under the regulation, the price charged during the market emergency is to be compared to the price "immediately prior to the onset of the market emergency." 940 CMR 3.18. Although it is not clear how "immediacy" is to be determined for purposes of this regulation, Depot Corner submits that the most natural and literal interpretation would be to employ the

---

[6] Requiring a palpable disparity between the price of the good and its value helps minimize the many dangers and problems often associated with substantive unconscionability, including its potential impairment of freedom of contract (where there are no procedural unconscionability concerns), and the risk that courts will engage in ill-advised paternalism. See Craig Horowitz, *Reviving the Law of Substantive Unconscionability: Applying the Implied Covenant of Good Faith and Fair Dealing to Excessively Priced Consumer Credit Contracts*, 33 UCLA L. Rev. 940 (1986) (outlining concerns over the concept of substantive unconscionability).

[7] The average retail price was $3.41. This number was determined by adding the retail prices from August 29, 2005 through December 1, 2005 and dividing that number by 94 days.

price charged on the day prior to the market emergency. Nevertheless, for purposes of this argument, Depot Corner will adopt an expansive construction of this term and assume that the week prior to the market emergency is "immediately prior."

In the week preceding the plaintiffs' proposed market emergency date, the average retail price Depot Corner charged for a gallon of gasoline was $3.29. (Paciello Affidavit, Exhibit A). The average price Depot Corner charged for a gallon of gasoline during the four months of the proposed market emergency period was $3.41, only 3.65% higher. The suggestion that a retailer whose average prices during a market emergency increase by only 3.65% is engaged in price-gouging is risible.

The plaintiffs appear to contend, however, that price-gouging should be assessed on a day-to-day basis, rather than on the basis of the average price during the market emergency period. It is not sensible, however, to allow the plaintiffs to cherry-pick the prices on individual days of the market emergency period when the prices, in their full context, so clearly militate any suggestion of price-gouging. Certainly nothing in the regulation appears to dictate such a methodology. Nevertheless, even if the plaintiffs were permitted to argue on the basis of the highest price charged during the proposed market emergency period, their price-gouging claim would fail because the highest price Depot Corner charged for a gallon of gasoline during the plaintiffs' proposed market emergency period was $3.89. (*Id.*). This constitutes an increase of a mere 18.23%. This small increase is a far cry from the pricing differences (normally multiples of the wholesale or retail price) that are usually necessary for "substantive unconscionability." Moreover, it should be observed that the differences between the price during the week preceding the market emergency, $3.29, and the average prices charged for the months of September and October are even lower, only 13.06% and 5.78%, respectively. The average price charged in November was actually *lower* than the price in the week preceding the market

emergency. (*Id.*). In sum, there was absolutely nothing unconscionable about the prices Depot Corner charged during the proposed market emergency period.

### D.     Gross Disparity

The Restatement (Second) of Contracts states:

> Inadequacy of consideration does not of itself invalidate a bargain, but *gross disparity* in the values exchanged may be an important factor in a determination that a contract is unconscionable and may be sufficient ground, without more, for denying specific performance

Restatement (Second) of Contracts, § 208, cmt. c (emphasis supplied). The seminal Massachusetts case on gross disparity of consideration is Waters v. Min Ltd., 587 N.E.2d 231, 233 (Mass. 1992). In Waters, the defendants persuaded the plaintiff to accept $50,000 for an annuity policy worth $694,000 over the twenty-five year term of the policy and which had a cash value at the time of the transaction of $189,000. The Supreme Judicial Court noted the circumstances surrounding the exchange (considerations bearing on procedural unconscionability), but also emphasized the terms of the exchange itself, remarking that "the cash value of the annuity policy at the time the contract was executed was approximately four times greater than the price to be paid by the defendants." Waters, 412 Mass. at 69; 587 N.E.2d at 234. The Court evidently thought that a four-fold disparity between the value of the annuity and its price drove "too hard a bargain" for the Court to "assist its enforcement." 412 Mass. at 68; 587 N.E.2d at 234. From the foregoing, it is evident that gross disparity, like substantive unconscionability, requires a substantial difference in values. Indeed, as Section C, *supra*, makes clear, gross disparity in consideration typically drives the substantive unconscionability determination.

In this case, there is no gross disparity between the prices charged before the market emergency and those charged after the market emergency. As was noted earlier, the greatest

price disparity in this case was rather modest. If an 18.23% difference constituted a "gross disparity," very little room would be left for disparities that are not "gross." Indeed the dictionary definition of "gross," itself, connotes a certain largeness of scale. See <u>Webster's Ninth New Collegiate Dictionary</u> 539 (1989) (providing definitions such as "glaringly noticeable" and "excessively fat").[8]

In sum, the prices charged by Depot Corner are neither "unconscionably excessive" nor "grossly disparate." Because the prices charged by Depot Corner do not fall within the scope of 3.18(2)(a), 3.18(2)(b) need not be reached and summary judgment on the plaintiffs' price-gouging claim must be granted in favor of Depot Corner.

### E.   It Is Price That Is Considered Under 3.18(2)(a), Not Margins

The plaintiffs' allegations of price-gouging are based primarily on the defendants' profit margins rather than the prices charged. (Amended Complaint at ¶¶ 77-86). Although consideration of margins may inform the analysis of the second prong (insofar as the margins may bear on the relationship between the wholesale cost and the price charged), the margins

---

[8] It should be noted, however, that the New York Court of Appeals held that price increases ranging from 5% and 60% (with most prices increased by less than 30%) sufficed to establish a prima facie case of price-gouging under the New York price-gouging law. <u>People by Abrams v. Two Wheel Corp.</u>, 525 N.E. 692 (N.Y. 1988). This case is distinguishable. Apart from the obvious fact that the New York court was not interpreting the Massachusetts regulation, the defendants in that case were increasing prices on goods already in their possession. <u>Id.</u> at 696. This buttressed the inference that they were taking unfair advantage of the market emergency, rather than responding to increased prices. In addition, price-gouging for the New York law reflected both the substantive and procedural dimensions of unconscionability; gross disparity was only evidence of price-gouging --- it was not price-gouging itself. The Massachusetts regulation, by contrast, essentially defines price-gouging in terms of gross a disparity that cannot be explained by increased costs. To put it another way, the two laws, although they employ common terms, have very different approaches to price-gouging. It bears mention that because the Massachusetts regulation is focused on substantive unconscionability to the exclusion of procedural concerns, it is all the more important that the substantive unconscionability of those terms be stark and apparent.

alleged by the plaintiffs have absolutely no bearing on whether the price Depot Corner charged before the hurricanes was grossly disparate to the prices it charged afterwards.[9]

## II.  Chapter 93A

The plaintiffs' arguments do not fare any better under Chapter 93A. The Attorney General has the authority to specify acts that violate Chapter 93A. Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 775, 407 N.E.2d 297, 306 (Mass., 1980) ("[T]he Legislature has, by G.L. c. 93A, s 2(c ), delegated to the Attorney General the power to promulgate rules and regulations defining with specificity acts and practices which violate G.L. c. 93A, s 2(a )."). Because the Attorney General has specified those actions that constitute price-gouging in violation of Chapter 93A, gasoline pricing decisions that fall short of the conduct proscribed in the regulation will not give rise to a violation of 93A.

## REQUEST FOR ORAL ARGUMENT

Depot Corner respectfully requests oral argument on its motion.

---

[9] The plaintiffs appear to rely heavily on an FTC Report, Investigation of Gasoline Price Manipulation and Post-Katrina Gasoline Price Increases (Spring 2006), which, according to the plaintiffs, stands for the proposition that margin increases over five cents per gallon constitutes price gouging. Their reliance upon this report is misplaced. The report itself remarks more than once that the term "price gouging" admits of many meanings, and is defined by various jurisdictions differently. FTC Report at 137 n.2, 189-97. In any case, it is the Massachusetts regulation that this Court is being called upon to interpret. The definition adopted in the FTC report --- which was utilized for the limited purpose of setting forth empirical findings and which was framed in accordance with the statute that enabled and funded the investigation giving rise to the report --- was not intended to provide an authoritative definition. It was certainly not meant to supplant states' authority to craft their own definition of price-gouging.

## CONCLUSION

The plaintiffs' price-gouging allegations are completely unfounded. Massachusetts law requires prices that are "unconscionably high" and that represent "gross disparities" between the prices charged before and after the commencement of a market emergency. The prices Depot Corner charged during the proposed market emergency period, were, on average, only 3.65% higher than the prices it charged before the proposed market emergency period. Even at their highest, these prices were never more than 18.23% greater than the pre-market emergency price. The plaintiffs' claim that Depot Corner engaged in price-gouging is entirely without merit.

For the reasons set forth in this memorandum, Depot Corner respectfully asks this Court to grant summary judgment in his favor on the price-gouging claim.

FRANCIS J.  PACIELLO and

DEPOT CORNER, INC.,

By their Attorney,

/s/Kevin C. Cain
Kevin C. Cain, BBO# 550055
PEABODY & ARNOLD LLP
Federal Reserve Building
600 Atlantic Avenue
Boston, MA 02210-2261
(617) 951-2100

## CERTIFICATE OF SERVICE

I, Kevin C. Cain, counsel for the Defendant Depot Corner, Inc., do hereby certify, that I have this date, served the **Memorandum in Support of Partial Summary Judgment**, by causing a copy thereof, to be sent electronically to the registered participants in this case as identified on the Notice of Electronic Filing (NEF) and paper copies mailed, first class mail, postage prepaid to any non-registered participants in this case.

Dated: December 3, 2008                                          /s/Kevin Cain
                                                                 Kevin C. Cain


PABOS2:TPOMARO:693633_1
15218-92604