UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM WHITE, R. CARLEEN CORDWELL, )<br>KEN BAILEY, NADINE MONACO, HENRY )<br>KRIEGSTEIN, JOAN KRIEGSTEIN, )<br>HILARY SCHULTZ, ANN BUTTRICK FLOYD, )<br>and SANDCASTLE REALTY, INC., )<br>                                  )<br>   Plaintiffs                  )<br>                                  )<br>v.                                   )<br>                                  )<br>R.M. PACKER COMPANY, INC., DRAKE )<br>PETROLEUM CO., INC., KENYON OIL )<br>COMPANY, DEPOT CORNER, INC., and )<br>FRANCIS J. PACIELLO d/b/a )<br>EDGARTOWN MOBIL, )<br>                                  )<br>   Defendants               ) | CIVIL ACTION<br>No. 07-CV-11601-RWZ |

**MEMORANDUM IN SUPPORT OF THE DEFENDANTS' JOINT
MOTION FOR SUMMARY JUDGMENT ON COUNT I (PRICE-FIXING[1])**

**INTRODUCTION**

This is a putative class action alleging price-fixing and price gouging in connection with the sale of retail gasoline on Martha's Vineyard. The defendants are the owners/operators of four of the nine gas stations located on the island[2]. The Plaintiffs' second amended complaint[3] asserts two counts. Count I alleges that the defendants' gasoline stations on Martha's Vineyard conspired to fix the retail price of gasoline at their stations in violation of the Sherman Act (15 U.S.C. § 1).

---

[1] The defendants have submitted separate Motions for Summary Judgment with respect to Count II (price gouging).
[2] The four stations are Tisbury Shell (located in Vineyard Haven and owned by R.M. Packer), XtraMart Citgo (located in Vineyard Haven and owned by Drake/Kenyon), Edgartown Mobil (located in Edgartown and owned by Francis Paciello) and Depot Corner (located in Edgartown and owned by Depot Corner, Inc.).
[3] The defendants have also filed a Motion to Dismiss the plaintiffs' price-fixing claim (Count I) on alternative

The plaintiffs' price-fixing claim fails as a matter of law because the plaintiffs have failed to produce sufficient evidence to raise a genuine issue of fact for a jury to find a price-fixing conspiracy. To avoid summary judgment on their price-fixing claim, the plaintiffs must introduce not only evidence that the defendants' pricing behavior was consciously parallel but also evidence that tends to exclude the possibility that the defendants' actions were merely interdependent. The plaintiffs' proposed evidence, including the plaintiffs' proposed expert testimony (which for purposes of this motion, the defendants will assume is admissible[4]), is insufficient for a reasonable fact-finder to conclude that the defendants entered into a price-fixing agreement.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS[5]

**Plaintiffs' Allegations Regarding Price-fixing**

The purported factual basis for plaintiffs' contentions regarding price-fixing among the defendants' retail stations rests on three pieces of evidence: (1) the existence of parallel prices among the defendant stations, (2) testimony from Steven Wehner regarding a meeting in 1999 with the then-president of Drake, and (3) the expert opinion of Frank Gollop. The defendants will illustrate below that each of one of these pieces of evidence are jointly and severally insufficient to carry the plaintiffs' burden of production. As an initial matter, the defendants offer this summary of the plaintiffs' expected evidence.

---

grounds (failure to state a claim due to lack of affect on interstate commerce) which is currently pending before this Court.
[4] The Court has not yet set deadlines for expert depositions or Daubert Motions.
[5] Pursuant to Local Rule 56.1, the defendants have filed herewith a concise statement of material facts as to which there is no genuine dispute, with page references to affidavits, depositions and other documentation.

**Parallel Prices**

For purposes of this motion, the defendants will assume that the prices at the defendants' gasoline stations are parallel and interrelated as alleged by the plaintiffs.

**Evidence regarding intercompany communications between Jim Ahearn (of Drake) and Ralph Packer**

In an attempt to find evidence beyond mere parallel pricing behavior, the defendants expect the plaintiffs to rely on the Affidavit and deposition testimony of Steven Wehner, a former island resident who unsuccessfully petitioned the Martha's Vineyard Commission to open his own gas station.

At his deposition, Mr. Wehner testified that he met with Jim Ahearn of Drake in 1999 to discuss whether Drake would be interested in supplying Wehner's proposed gas station or leasing such property to run its own station. As a result of that meeting, Mr. Wehner claims that he "got the impression that on retail price . . . that Ralph [Ralph Packer] set the price and that Drake followed it, . . .". (See Statement of Undisputed Facts, ¶12.) The basis of Mr. Wehner's impression was an alleged phone call by Jim Ahearn to Ralph Packer, in which Mr. Wehner claims he heard Mr. Ahearn call Ralph Packer on the speakerphone and say something to the effect of "I'm checking in, how are you?" (See Statement of Undisputed Facts, ¶13.) "They [Ahearn and Packer] did not talk about pricing or anything like that." (See Statement of Undisputed Facts, ¶14.) In the context of a discussion regarding leasing the property, Ahern also allegedly told Wehner that "Ralph and I talk;" and, in response to Wehner's question whether Drake would consider giving a 10 cent discount to island residents, said, "Ralph Packer is not giving the people anything, I'm not going to give them anything." (See Statement of Undisputed Facts, ¶15.) Ahearn also allegedly suggested that if the Edgartown stations "started dropping

prices . . . one or two delivery trucks might not make it on the boat and they'll get the idea real quick." (See Statement of Undisputed Facts, ¶16.) Wehner then offered his opinion: "it was my understanding that they [Drake – a wholesale supplier to the Edgartown stations] orchestrated the delivery trucks, that it was in their purview to have a delivery not make it every once in a while maybe if they needed to get somebody's attention because they controlled the delivery." Id. Of course, Wehner's "understanding" ignores the fact that Drake has a supply contract with the Edgartown stations and that Drake would lose money by disrupting the supply to Edgartown because the Edgartown stations could get their gas from another supplier if Drake acted this way. On the subject of price-fixing, Wehner admitted however that he is "not aware of any conversations between anyone at R.M. Packer and anyone at Drake regarding pricing of gasoline on Martha's Vineyard" and has no evidence of any price fixing involving the Paciello defendants either. (See Statement of Undisputed Facts, ¶18.)

**Plaintiffs' Proposed Expert Testimony**

The plaintiffs' proposed expert, Frank Gollop, examined the prices of all the defendant stations and compared them to prices charged in three towns on Cape Cod during the same period. He did not compare the defendants' prices to the prices charged by the other five gas stations on the island, including two stations in Oak Bluffs located less than three miles away from the two defendants in Vineyard Haven (miles nearer than the defendants in Edgartown are to those in Vineyard Haven). Indeed, his report is entirely silent regarding the presence of the five other gasoline stations located on Martha's Vineyard and the extent to which they participate in the sale of retail gasoline on the island. (See Statement of Undisputed Facts, ¶19.)

Comparing the defendants' prices to those in selected towns on Cape Cod, Gollop concludes that the gasoline sold at the defendants' stations was sold at "supra-competitive"

4

prices "during at least the August 2003 through July 2008 period." (See Statement of Undisputed Facts, ¶ 20.) Next, comparing the daily price data for the four defendant stations to each other, Gollop finds that the defendants engaged in "parallel pricing." (See Statement of Undisputed Facts, ¶21.) Examining the defendants' daily price and cost data, Gollop states that the inferences to be drawn from the pricing behavior are "mixed". (See Statement of Undisputed Facts, ¶22.) Gollop states that there are instances where the evidence is "not inconsistent with either cooperative or non-cooperative behavior" and others where the pricing pattern is "not inconsistent with non-cooperative behavior." (See Statement of Undisputed Facts, ¶23.) Obviously, these conclusions are not evidence of price-fixing.

Gollop's only conclusion favoring the plaintiffs' theory is that there are some limited time intervals in which the pricing patterns are "inconsistent with independent, non-cooperative behavior." (See Statement of Undisputed Facts, ¶24.) For example, Gollop opines that the price pattern he examined between May of 2004 and September of 2004 "was not the expected non-cooperative business strategy." (See Statement of Undisputed Facts, ¶25.) Similarly, Gollop opines, "the patterns of pricing in the post-Katrina interval . . . are inconsistent with the model of non-cooperative behavior." (See Statement of Undisputed Facts, ¶26.) The plain meaning of these opinions is that Gollop finds evidence of conscious parallelism. After finding conscious parallelism, Gollop next considers three " 'plus factors' from which [according to plaintiffs' counsel] courts can infer a conspiracy when found in conjunction with 'conscious parallelism.' " (See Statement of Undisputed Facts, ¶27.) The three plus factors he considers are: (1) abnormal profits, (2) fixed market shares for substantial periods of time, and (3) existence of an industry conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." (See Statement of Undisputed Facts, ¶28.)

First, on the subject of profits, Gollop concludes that the profits among the gas stations are consistent with interdependent but otherwise non-cooperative competition. (See Statement of Undisputed Facts, ¶29.) Similarly, with respect to market shares, Gollop reaches an ambiguous conclusion that the evidence does not suggest cooperative or non-cooperative behavior. (See Statement of Undisputed Facts, ¶30.) Considering the evidence of parallel pricing, Gollop also acknowledges, "No unambiguous conclusion regarding cooperative or non-cooperative pricing can be gleaned from this pattern of parallel pricing. The observed pattern of parallel pricing is not inconsistent with either form of pricing behavior." (See Statement of Undisputed Facts, ¶31.) Lastly, on the subject of the market structure, Gollop concludes that it reveals "an economic environment conducive to oligopolistic pricing. The principal market characteristics are barriers to entry and inelastic demand." (See Statement of Undisputed Facts, ¶32.) Thus, Gollop's does not find any plus factor evidence from which to infer an actual conspiracy.

## ARGUMENT

**THERE IS INSUFFICIENT EVIDENCE FOR A REASONABLE JURY TO FIND THAT THERE AS AN EXPLICIT AGREEMENT, NOT MERELY A TACIT ONE, TO SET PRICES AMONG THE DEFENDANT RETAIL GAS STATIONS.**

**Standard for Summary Judgment Applied in Conscious Parallelism Cases**

To establish their price-fixing claims, the plaintiffs must show a contract, combination or conspiracy, that is, concerted action between distinct parties. 15 U.S.C. §1. In the context of price-fixing cases, the Supreme Court distinguishes between agreements to fix prices, which are prohibited under the Sherman Act, and "conscious parallelism," which is not. As former First Circuit Chief Judge (now Supreme Court Justice) Breyer stated in <u>Clamp-All Corp. v. Cast Iron Soil Pipe Institute, et al</u>:

"Courts have noted that the Sherman Act prohibits *agreements*, and they have almost uniformly

6

held, at least in the pricing area, that such individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement under Section 1 of the Sherman Act." 851 F.2nd 478, 484 (1st Cir. 1988) (superseded on other grounds).

Therefore, in order to survive a summary judgment motion, the plaintiffs must produce "evidence that tends to exclude the possibility of independent action by the [parties]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the [parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984). Conduct that is "as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The plaintiffs must produce evidence that "tends to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." City of Tuskaloosa v. Harcros Chems., Inc., 158 F.3rd 571, 588 (11th Cir. 1998). The plaintiffs must produce evidence consistent solely with concerted action. The lower courts call this type of evidence a "plus factor."

The plaintiffs base their price-fixing claim on a theory of conscious parallelism. For purposes of this motion only, the defendants acknowledge that there is evidence of parallel pricing behavior among the defendants. Such "conscious parallelism" (or tacit collusion) is "the process, *not in itself unlawful*, by which firms in a concentrated market might effect a shared monopoly power, setting their prices at a profit maximizing, supra-competitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007), quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993) (emphasis added). Evidence of such "tacit collusion" or "oligopolistic price coordination" in which a

7

business consciously meets the pricing of its competitors does not prove a violation of the Sherman Act.  The Supreme Court and circuit courts construing the Sherman Act have recognized that in oligopolistic markets where a few firms dominate a particular market, a phenomenon exists in which markets may behave in a non-competitive manner resembling price fixing <u>without</u> any actual agreement or conspiracy on the part of the competitors.  This phenomenon is known as conscious parallelism.  For instance, a seller (such as a gas station) may raise its prices in a competitive market in anticipation that competitors will likely follow by also raising their prices, recognizing the extra profit to be made.  Such "tacit agreements" have been termed "interdependent behavior" and are not themselves unlawful.  <u>See</u> <u>e.g.</u>, <u>Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.</u> 346 U.S. 537, 541 (1954) (holding that parallel business behavior is not itself a violation of the Sherman Act); <u>In re Flat Glass Antitrust Litig.</u>, 385 F.3rd 350, 360 (3rd Cir. 2004) (finding conscious parallelism alone is not prescribed by Sherman Act); <u>Williamson Oil Co., Inc. v. Philip Morris USA</u>, 346 F.3rd 1287, 1300-01 (11th Cir. 2003); <u>In Re High Fructose Corn Syrup Antitrust Litigation</u>, (295 F. 3rd 651, 654 (7th Cir. 2002); <u>Blomkest Fertilizer v. Potash Corp. of Saskatchewan</u>, 203 F.3rd 1028, 1033 (8th Cir. 2000); <u>Clamp-All Corporation v. Cast Iron Soil Pipe Institute, et al.</u>, 851 F.2nd 478, 484 (1st Cir. 1988) (such pricing decisions are not prohibited "even when each firm rests its own decision upon its belief that competitors will do the same") (superseded on other grounds).

"The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964 (2007). This is why the courts require plaintiffs to present additional evidence (a/k/a "plus factors) beyond

mere parallel pricing that tends to show that the parallel pricing among competitors was the result of an agreement and not merely lawful, interdependent actions of competitors who meet one another's prices. Otherwise the jury will be forced to engage in speculation and conjecture, to such a degree as to render its finding a guess or more possibly. <u>Williamson Oil Co., Inc.</u> 346 F. 3rd at 1302.

Perhaps recognizing that evidence of parallel pricing is insufficient as a matter of law to meet the plaintiffs' burden of production, the plaintiffs may seek to rely on other circumstantial evidence – namely, Wehner's testimony and Prof. Gollop's testimony. However, neither piece of evidence, whether the court considers them separately or together, is sufficient for a reasonable jury to find that there was an actual agreement to fix prices rather than a merely lawful, tacit one in which the parties engaged in parallel conduct with full awareness of their rivals' likely responses.

**Steven Wehner's Testimony is Neither Probative nor Likely to Assist the Jury on the Issue of Whether the Defendants Had an Actual Agreement to Fix Prices**

In terms of non-economic evidence, the best the plaintiffs can muster is the testimony of Steven Wehner, who unsuccessfully petitioned the Martha's Vineyard Commission to open his own gas station. Even if one is to believe Wehner, and providing all benefit of the doubt to his contested testimony[6], Wehner's testimony merely shows that Drake did not want to operate a "discount" gas station in Tisbury on Martha's Vineyard as proposed by Mr. Wehner's group, Tisbury Fuel Services. This is hardly evidence of a price fixing agreement among the defendants.

In his deposition testimony Mr. Wehner's arguably "strongest" statement against the defendants is: "I got the *impression* that on the retail price . . . that Ralph [Ralph Packer] set the

---

[6] Although not an issue for purposes of summary judgment, the defendants deny most of Wehner's testimony.

9

price and that Drake followed it . . ." (See Statement of Undisputed Facts, ¶12.) (emphasis added). Wehner's suspicions are obviously not evidence. What he actually heard is the only potentially admissible evidence, and what he heard was merely Jim Ahern call Ralph Packer on a speakerphone and say, "I'm checking in." (See Statement of Undisputed Facts, ¶13). According to Wehner, Ahern also allegedly said, Ralph and I talk . . ." and "Ralph Packer is not giving the people anything, I'm not going to give them anything." (See Statement of Undisputed Facts, ¶15.) Wehner admitted however that, "They [Ahearn and Packer] did not talk about pricing or anything like that." (See Statement of Undisputed Facts, ¶14.) Giving all benefit of the doubt to the plaintiffs with respect to Wehner's testimony, at most it shows that Wehner suspected a follow the leader scenario of pricing between Packer and Drake's stations, i.e., Tisbury Shell and XtraMart Citgo. Wehner's "impression" is irrelevant. First, this alleged conversation was so clearly ambiguous and vague that no one can draw a reasonable inference from it. Moreover, even if Wehner's impression were correct, it merely shows that in 1999, Drake and Packer priced according to a "follow the leader" pattern.

The defendants also anticipate that the plaintiffs will point to Wehner's testimony in which he relates an alleged statement by Ahearn that if the Edgartown stations "started dropping prices . . . one or two delivery trucks might not make it on the boat and they'll get the idea real quick." (See Statement of Undisputed Facts, ¶16.) Based upon these alleged comments, Wehner testified "it was my *understanding* that they [Drake – a wholesale supplier to the Edgartown stations] orchestrated the delivery trucks, that it was in their purview to have a delivery not make it every once in a while maybe if they needed to get somebody's attention because they controlled the delivery." (See Statement of Undisputed Facts, ¶17.) (emphasis added). This "understanding" ignores the facts that Drake has a supply contract with the Edgartown stations

10

and that Drake would lose money by disrupting the supply to Edgartown, and that the Edgartown stations could get their gas from another supplier if Drake acted this way. Nevertheless, putting aside the paucity, reasonableness, or credibility of Wehner's "understanding," it is critical to note that Ahearn's alleged bravado and hypothetical threats are not evidence of an agreement. At most, Ahearn's alleged statements are evidence of Drake's power over the supply to two gas stations on the island, nothing more. Assuming for the sake of argument that Wehner's testimony is true and admissible, and that his "understanding" was correct such that Ahearn could conceivably bully the Edgartown stations as Wehner has suggested, his understanding and Ahearn's alleged statements are not evidence that the defendants agreed to foreswear price competition. Taking Wehner at his word, his testimony is merely evidence that Drake, as a supplier, had an adversarial relationship with two of the four defendants and could affect their supply of wholesale gasoline. It is not evidence suggesting any explicit agreement to set prices among the four defendants. Therefore, Wehner's testimony is not sufficient to enable a reasonable jury to reject the possibility that the four stations set their prices without an actual price fixing agreement.

**Even Accepting Plaintiffs' Purported Expert Testimony, That Expected Testimony Does Not Tend to Exclude the Possibility of Merely Interdependent Pricing Behavior**

As an initial matter, plaintiffs' theory of conspiracy is implausible. Economic plausibility is relevant in evaluating the plaintiffs' evidence for purposes of motions for summary judgment. The less plausible the plaintiffs' theory, the greater scrutiny the court should give to the plaintiffs' evidence. See <u>Matsushita</u>, 475 U.S. at 588. The plaintiffs assert that only four of the nine gas stations on Martha's Vineyard conspired to set prices of gasoline. If the defendants were conspiring to set the prices of retail gasoline on Martha's Vineyard, why would the defendants not include two nearby stations in their conspiracy? Plaintiffs' expert, Frank Gollop,

11

nevertheless ignores the remaining five stations in his analysis, including two stations in Oak Bluffs located less than three miles away from the two defendants in Vineyard Haven (miles nearer than the defendants in Edgartown are to those in Vineyard Haven). Indeed, his report is entirely silent regarding the presence of the five other gasoline stations located on Martha's Vineyard and the extent to which they participate in the sale of retail gasoline on the island. For this reason alone, plaintiff's theory and Gollop's opinions are inadequate to raise a jury question.

Beyond Gollop's failure even to address other Martha's Vineyard stations, his report and expected testimony is striking in its failure to aid the plaintiff's prima facie case. Gollop's conclusions, taken in their most pro-plaintiff light are that the defendants sold gasoline at "supra-competitive" prices (not unlawful) and that the defendants engaged in "interdependent" pricing behavior (not unlawful). Gollop's opinions are therefore insufficient to raise a genuine issue regarding price fixing. Specifically, Gollop concludes that the defendants sold gasoline at their stations at "supra-competitive" prices during at least the August 2003 through July 2008 period. (See Statement of Undisputed Facts, ¶20.) Gollop's conclusion is not probative, however. As the Supreme Court has repeatedly held, "supra-competitive" is not a synonym for "fixed." In fact, "supra-competitive" prices are lawful and expected in cases of conscious parallelism. See e.g., Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007). Because such evidence is ambiguous, showing "supra-competitive" or interdependent pricing is inadequate to demonstrate conspiracy. Id. As Gollop himself states, the inferences to be drawn from the pricing behavior are "mixed". (See Statement of Undisputed Facts, ¶22.) Gollop states that there are instances where the evidence is "not inconsistent with either cooperative or non-cooperative behavior." In plain English, this means that the evidence is consistent with both independent and cooperative behavior. Gollop repeats this conclusion in several places within his report. However,

12

ambiguous evidence is insufficient to carry the plaintiff's burden of production.  See Matsushita, 475 U.S. at 588 and In Re Flat Glass, 385 F.3rd at 358.  Furthermore, equivocal expert opinions that merely indicate the possibility of the existence of an element of the plaintiff's prima facie case are insufficient as a matter of law.  See e.g., Somers' Case, 344 Mass. 581, 584 (Mass. 1962).

Gollop's strongest conclusion is that there are instances that are "inconsistent with independent, non-cooperative behavior."  In other words, removing the double negatives, Gollop opines that the evidence is consistent with interdependent and cooperative behavior.  Unfortunately for the plaintiffs, federal anti-trust law prohibits neither interdependent nor cooperative behavior.  Gollop's opinion is *at most* evidence suggesting a tacit agreement – but tacit agreements are not unlawful.  Clamp-All Corporation v. Cast Iron Soil Pipe Institute, et al., 851 F.2nd 478, 484 (1st Cir. 1988) (overruled on other grounds); In Re High Fructose Corn Syrup Antitrust Litigation, (295 F. 3rd) 651, 654 (7th Cir. 2002).  The plaintiffs must show much more, that is, an explicit agreement.  As Judge Breyer wrote for the First Circuit in Clamp-All, "Individual pricing decisions, (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement under Section 1 of the Sherman Act."  Clamp-All Corporation v. Cast Iron Soil Pipe Institute, et al., 851 F.2nd 478, 484 (1st Cir. 1988) (overruled on other grounds). As Judge Breyer explained, "It is close to impossible to devise a judicially enforceable remedy for 'interior dependent' pricing.  How does one order a firm to set its prices *without regard*  to the likely reactions of its competitors? See 6 Areeda & Turner, paragraphs 1432-33; 3 Areeda & Turner, para. 840.  The District Court pointed out that the evidence here, consisting of little more than the price list, would not permit a finding of more than such individual, interdependent, price-setting." Clamp-All Corporation v.

Cast Iron Soil Pipe Institute, et al., 851 F.2nd 478, 484 (1st Cir. 1988) (overruled on other grounds).

Professor Gollop opines that the price patterns he examined between May of 2004 and September of 2004 "was not the expected non-cooperative business strategy." Again, this opinion is insufficient to raise an issue regarding price-fixing. It is not evidence that tends to exclude the possibility of merely interdependent behavior, which is necessary according to the standards set forth by the Supreme Court in Matsushita, 475 U.S. 574, 588 (1986). The plaintiffs have therefore failed to meet their burden to produce sufficient evidence to raise a genuine issue of fact for the jury. To avoid summary judgment, the plaintiffs must introduce not only evidence that the defendants' actions were consciously parallel, (which is what Gollop concludes, and the defendants do not dispute for purposes of this motion for summary judgment) but also something more, namely a "plus factor" which is evidence that tends to exclude the possibility that the defendants' actions were merely interdependent. Id., Matsushita, 475 U.S. 574, 588 (1986); City of Tuskaloosa v. Harcros Chems., Inc., 158 F.3rd 571, 588 (11th Cir. 1998).

On the subject of plus factors, Gollop does not present any evidence to suggest a conspiracy. In fact, Gollop does just the opposite. He examines three types of plus factors and finds no unambiguous evidence. For example, on the subject of profits, Gollop concludes that the profits among the gas stations are consistent with interdependent but otherwise non-cooperative competition. Similarly, with respect to market shares, Gollop reaches an ambiguous conclusion that the evidence does not suggest cooperative or non-cooperative behavior. Lastly, on the subject of the market structure, Gollop concludes that it reveals "an economic environment conducive to oligopolistic pricing." (See Statement of Undisputed Facts, ¶32.) Again, Gollop's opinion is just further evidence that Martha's Vineyard is a market conducive to

conscious parallel pricing, which the defendants admit. The bottom line is that Professor Gollop does not provide any testimony that provides a "plus factor" beyond conscious parallelism. Providing all evidentiary benefits to the plaintiffs, they cannot sustain their burden or even an inference of a conspiracy.

Without any plus factor evidence, Gollop is left with the undisputed conclusion of parallel pricing, but as Gollop admits: "No unambiguous conclusion regarding cooperative or non-cooperative pricing can be gleaned from this pattern of parallel pricing. The observed pattern of parallel pricing is not inconsistent with either form of pricing behavior." (See Statement of Undisputed Facts, ¶31.) To the extent the evidence is merely ambiguous, it is insufficient to carry the plaintiff's burden of production. See Matsushita, 475 U.S. at 588 and In Re Flat Glass, 385 F.3rd at 358. Therefore, even accepting for the sake of argument Gollop's conclusions, they are insufficient to raise an issue of fact on this critical point.

## CONCLUSION

The plaintiffs must produce evidence that tends to exclude the inference of interdependent oligopolistic behavior in order to meet their burden of production on their claim of price-fixing. By failing to do so, there is not enough evidence for a reasonable jury to find that there was an actual agreement among the four defendants to fix prices. Accordingly, the Court should dismiss Count I of the plaintiffs' Second Amended Complaint.

> The defendants,
> DRAKE PETROLEUM CO., INC. and
> KENYON OIL COMPANY,
> By their attorneys,
>
> /s/ William J. Fidurko
> Brian A. O'Connell (BBO# 551182)
> William J. Fidurko (BBO# 567064)

        ZIZIK, POWERS, O'CONNELL,
        SPAULDING & LAMONTAGNE, P.C.
        690 Canton Street, Suite 306
        Westwood, MA 02090
        (781) 320-5402

        The defendants,
        R.M. Packer, Co., Inc.
        By its attorneys,

        /s/ Richard W. Paterniti
        Patrick T. Jones (BBO# 253960)
        Peter J. Schneider (BBO# 446520)
        Richard W. Paterniti (BBO# 645170
        COOLEY MANION JONES, LLP
        21 Custom House Street
        Boston, MA 02110
        (617) 737-3100

        The defendants,
        FRANCIS J. PACIELLO d/b/a
        EDGARTOWN MOBIL AND DEPOT
        CORNER, INC.,
        By their attorneys,

        /s/ Kevin C. Cain
        Kevin C. Cain (BBO# 550055)
        PEABODY & ARNOLD LLP
        600 Atlantic Avenue
        Boston, MA 02210
        (617) 951-2100

Dated:  May 15, 2009

## CERTIFICATE OF SERVICE

    I, William J. Fidurko, counsel for the defendants DRAKE PETROLEUM CO., INC. and KENYON OIL COMPANY, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 15th day of May, 2009.

        /s/ William J. Fidurko
        William J. Fidurko (BBO# 567064)